Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Mary Rofaeil (TX 24119467)
Zachary C. Zahn (TX 24137675)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
mary.rofaeil@foley.com
zzahn@foley.com

Ann Marie Uetz (*pro hac vice* forthcoming)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7100
Facsimile: (313) 234-2800
auetz@foley.com

Michael J. Small (*pro hac vice* forthcoming)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
msmall@foley.com

**PROPOSED COUNSEL TO DEBTORS
AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Stoli Group (USA), LLC, *et al.*,[1] | § § | Case No.: 24-80146-swe-11 |
| Debtors. | § § § | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III)
MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL
HEARING; AND (V) GRANTING RELATED RELIEF**

Stoli Group (USA), LLC ("**Stoli USA**") and Kentucky Owl, LLC ("**KO**"), as debtors and

debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the

"**Chapter 11 Cases**") file this their *Debtors' Emergency Motion for Entry of Interim and Final*

*Orders (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection;*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number, are Stoli Group (USA), LLC (5602) and Kentucky Owl, LLC (3826). The Debtors' address is 135 East 57th Street, 9th Floor, New York City, New York.

*(III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related*

*Relief* (the "**Motion**"). In support of the Motion, the Debtors respectfully state as follows:

**I.**
**BANKRUPTCY RULE 4001 SUMMARY**[2]

1. In accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), the following table summarizes the material terms of the proposed

interim order (the "**Interim Order**") attached hereto as **Exhibit A:**

| SUMMARY OF MATERIAL TERMS | | |
|---|---|---|
| **Name of Entity with Interest in the Cash Collateral** | Fifth Third Bank, National Association (Lender) | Interim Order     ¶ E. |
| **Purposes for the Use of the Cash Collateral** | Cash Collateral shall be used to fund working capital, operating expenses, capital expenditures, fixed charges, payroll, and all other general corporate purposes arising in the Debtors' ordinary course of business only as shown on the Budget, as well as allowed administrative costs, including, but limited to, professional fees and expenses. | Interim Order ¶ 5. |
| **Duration of Use of Cash Collateral** | Unless extended by the entry of a further order of the Court, the interim authorization granted to the Debtors to use Cash Collateral under the Interim Order shall terminate upon the earlier of (i) two (2) business days following the date of the Final Hearing, or any later date the Lender agrees upon in writing; (ii) the date on which a Final Order is entered; (iii) the date upon which a chapter 11 or chapter 7 trustee, or examiner with authority to operate or possess any Debtor's assets, is appointed in any of the Chapter 11 Cases; (iv) the date upon which any of the Chapter 11 Cases are dismissed or converted; (v) the date upon which the Debtors file a motion seeking to use Cash Collateral without Lender's consent or to incur postpetition debt on a basis secured by interests in the Prepetition Collateral that are senior or pari passu with the interests of Lender in the Prepetition Collateral (or the initial loan proceeds of which would not be used to indefeasibly repay the Prepetition Indebtedness in full); and (vi) the occurrence of an uncured Event of Default (defined below) by any of the Debtors under this Interim Order. | Interim Order ¶ 7. |

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms below or in the Interim Order.

| SUMMARY OF MATERIAL TERMS | | |
|---|---|---|
| **Debtors' Stipulations** | Subject to the entry of the Final Order, the Debtors stipulate that (i) the Debtors are parties to the Prepetition Loan Documents, (hereinafter defined), including (a) the Stoli Credit Agreement (hereinafter defined), by and between Debtor Stoli USA, and any and all other documents, agreements, or instruments executed in connection with the Stoli Credit Agreement, and (b) the KO Credit Agreement (hereinafter defined), by and between Debtor KO, and any and all other documents, agreements, or instruments executed in connection with the KO Credit Agreement, and any and all other documents, agreements, or instruments executed in connection with the KO Credit Agreement; (ii) computed as of November 27, 2024, the Debtors are separately liable to the Lender in the outstanding principal amount of $78,374,334.30 (together with all interest, fees, costs, and charges accrued or accruing prior to, on, or after the Petition Date, if applicable, collectively, the "**Prepetition Indebtedness**"), all of which is due and owing under the Prepetition Loan Documents, comprised of (i) $41,033,893.58 owed by Debtor Stoli and (ii) $37,340,440.72 owed by Debtor KO; (iii) as security for repayment of the Prepetition Indebtedness, respectively, the Lender holds valid, senior, perfected, and enforceable liens (the "**Prepetition Liens**") in all of the collateral described in the various Prepetition Loan Documents, (collectively, the "**Prepetition Collateral**"); (iv) (a) all of the amounts owing to the Lender pursuant to the Prepetition Loan Documents are due and owing, and are legally binding and enforceable obligations of each of the Debtors, respectively; (b) the interests and liens of the Lender in, to, and against all of the Prepetition Collateral, respectively are valid, enforceable and properly perfected, and are not subject to avoidance, marshalling, or other challenge under any state or federal law; and (d) there are no existing claims or causes of action of the Debtors, whether liquidated or unliquidated, direct or indirect, and whether arising under state or federal law (including the Bankruptcy Code) against the Lender, arising from the relationship between the Debtors, on one hand, and the Lender, on the other hand; and (v) the Lender's Prepetition Collateral includes cash proceeds and other cash equivalents, and all cash and cash equivalent proceeds of the Prepetition Collateral, constituting cash collateral of the Debtors within the meaning of 11 U.S.C. § 363(a) (the "**Cash Collateral**"). | Interim Order ¶ E. |
| **Adequate Protection** | The following adequate protection ("**Adequate Protection**") is provided to the Lender as adequate protection of the Lenders' asserted pre-Petition Date security interests in the Prepetition Collateral: <br><br> **Replacement Liens.** Notwithstanding anything in section 552 of the Bankruptcy Code to the contrary, the Interim Order provides that Lender is granted, from and after the Petition Date, replacement liens | Interim Order ¶ 9. |

| | SUMMARY OF MATERIAL TERMS | |
|---|---|---|
| | and security interests in all of the Debtors' assets, including, without limitation, all accounts and inventory acquired by the Debtors after the Petition Date, specifically including all cash proceeds arising from such accounts and inventory acquired by the Debtors after the Petition Date (but excluding any causes of action under chapter 5 of the Bankruptcy Code) (the "**Adequate Protection Collateral**" and, together with the Prepetition Collateral, collectively, the "**Collateral**"), in the same nature, extent, priority, and validity that such liens existed on the Petition Date (the "**Replacement Liens**"). The Replacement Liens shall secure the Lender to the extent necessary to adequately protect the Lender from any diminution in value of its interests in property of the Debtors' estates as a result of the entry of the Interim Order and the use of Cash Collateral authorized thereby, and shall have the same validity, priority, and enforceability as Lenders' liens on the Debtors' assets on the Petition Date; provided, however, the Replacement Liens shall be junior in priority and in payment to the Carve Out (defined below) upon entry of the Final Order. The Replacement Liens are granted effective as of the Petition Date, without the necessity of the execution by the Debtors of any security agreement, pledge agreement, financing statement, or any other documents, or the necessity of any kind of financing statement or other filing by the Lender.<br><br>**Super-Priority Claims.** To the extent the Replacement Liens granted to the Lender in the Interim Order do not provide the Lender with adequate protection of its interests in the Cash Collateral, the Lender shall have superpriority administrative expense claims in each of the Bankruptcy Cases under Bankruptcy Code § 507(b) with priority over every other administrative claim of any kind (the "**Super-Priority Claims**"). Subject only to the Carve Out upon entry of the Final Order, the Super-Priority Claims of the Lender shall have priority over all other administrative expenses incurred in the Chapter 11 Cases of any kind, including such administrative expenses of the kinds specified in, or allowable under, sections 365(d)(3), 506(c), 507(a) or 507(b) of the Bankruptcy Code. Other than the Carve Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases, any conversion of the Chapter 11 Cases proceedings pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related hereto, and no priority claims are, or will be, prior to or on parity with the Super-Priority Claims of the Lender. | |
| **Carve Out** | Subject to the entry of the Final Order, "**Carve Out**" means, the sum of (i) all fees and expenses required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "**Statutory Fees**"); (ii) all | Interim Order ¶ 10. |

| | SUMMARY OF MATERIAL TERMS | |
|---|---|---|
| | reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the foregoing, collectively, **"Professional Fees"**) before or on the first business day following delivery by the Lender of a written notice delivered by email (or other electronic means) to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the **"Carve-Out Trigger Notice"**); and (iv) Professional Fees in an aggregate amount not to exceed $300,00.00 incurred after the first business day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in clause (iv) being the **"Post-Carve-Out Trigger Notice Cap"**); provided that, nothing shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds. | |
| **Events of Default** | a. If the Debtors' actual operating disbursements under the Budget exceed the amounts set forth in the Budget by more than the Budget Variance without the prior written consent of the Lender or prior authority from the Court; <br><br> b. If the Debtors pay obligations not shown on the Budget without the prior written consent of the Lender or further authority from the Court; and <br><br> c. If the Debtors breach any other term, provision, or requirement of the Interim Order. | Interim Order ¶ 12. |
| **Remedies** | Upon the occurrence of an Event of Default, the Lender may give written notice thereof to lead bankruptcy counsel to the Debtors, counsel for any official committee (a **"Committee"**) appointed in the Chapter 11 Cases (if any), and counsel for the U.S. Trustee (the **"Default Notice"**). <br><br> With respect to an Event of Default as to which a Default Notice has been delivered by the Lender in accordance with the Interim Order, the Debtors, the Committee (if any), and the U.S. Trustee shall have three (3) business days from the date of the Default Notice (the **"Remedy Notice Period"**) to either cure the Event of Default or obtain an order of the Court on notice to the Lender (a) enjoining or restraining the Lender from taking action or exercising rights and | Interim Order ¶ 13. |

| SUMMARY OF MATERIAL TERMS | | |
|---|---|---|
| | remedies based upon the Event of Default specified in the Default Notice (a "**Restraint on Remedies**"), or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure. During the Remedy Notice Period, the Lender shall refrain from exercising its rights and remedies. | |
| **Challenge Period** | Notwithstanding any other provisions of the Interim Order, any interested party in these cases other than the Debtors, including, without limitation, the Committee (if any), shall have until the earlier of the date that is 75 calendar days from the Petition Date or 60 calendar days after a Committee is formed (such period, the "**Challenge Period**"), to commence an adversary proceeding against the Lender for the purpose (collectively, a "**Challenge Action**") of challenging the validity, extent, priority, perfection, enforceability and non-avoidability of the Lender's Prepetition Liens against the Prepetition Collateral. All parties in interest, including, without limitation, the Committee (if any), that fail to commence a Challenge Action prior to the expiration of the Challenge Period shall be barred forever from commencing a Challenge Action and shall be bound by the Stipulations and terms set forth in the Interim Order. | Interim Order 14. |
| **Binding Effect** | The provisions of the Interim Order shall be binding upon and inure to the benefit of the Debtors, the Lender, and any Committee appointed in this case, and their respective successors and assigns, including any trustee hereafter appointed in these Bankruptcy Cases. | Interim Order ¶ 15. |

## II.
## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to the entry of a final order by the Court.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105, 361, 362, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014.

## III.
## BACKGROUND

**A.      The Chapter 11 Cases**

5.      On November 27, 2024, (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), thereby initiating the Chapter 11 Cases and creating their respective bankruptcy estates (the "**Estates**"). The Debtors remain in possession of their property and are managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Court has not appointed a trustee, and no official committee has been established.

6.      Information on the Debtors, their businesses, and a summary of the relief requested in this Motion can be found in the *Declaration of Chris Caldwell in Support of First Day Motions* (the "**First Day Declaration**"), filed concurrently herewith and incorporated herein by reference.

**B.      The Prepetition Loan Documents**

7.      Prior to the Petition Date, each of the Debtors entered into and obtained separate senior secured revolving credit facilities from Fifth Third Bank, National Association, a national banking association (the "**Lender**").

8.      Debtor Stoli USA is a borrower under that certain Credit Agreement dated October 28, 2022, by and between Debtor Stoli USA and the Lender (the "**Stoli Credit Agreement**"), and, together with related loan documents, agreements, or instruments executed in connection with the Stoli Credit Agreement, and as amended, restated, modified, or supplemented, the "**Stoli Loan Documents**"). Via the Stoli Credit Agreement, Debtor Stoli USA was provided a revolving credit facility in an aggregate amount of $50,000,000 (the "**Stoli Revolver**").

9.      Debtor KO is a borrower under that certain Amended and Restated Credit Agreement dated as of February 3, 2023, by and between Debtor KO and the Lender (the "**KO Credit Agreement**"),  and, together with related loan documents, agreements, or instruments executed in connection with the Stoli Credit Agreement, and as amended, restated, modified, or supplemented, the "**KO Loan Documents**," and collectively with the Stoli Loan Documents, the "**Prepetition Loan Documents**"). Via the KO Credit Agreement, Debtor KO was provided a revolving credit facility in an aggregate amount of $40,000,000 (the "**KO Revolver**," collectively with the Stoli Revolver, the "**Revolver Commitment**").

10.     The amounts owed under the Prepetition Loan Documents are secured by a first-priority lien on substantially all of the Debtors' assets, respectively. Moreover, the Lender alleges that the Debtors' collective obligations under the Prepetition Loan Documents are further secured via cross-collateralization and that the Debtors are purportedly guarantors of each other's obligations under the Prepetition Loan Documents pursuant to (a) that certain Joinder Agreement dated February 15, 2023, by and between Debtor Stoli USA and the Lender (the "**Stoli Joinder**") and (b) that certain Joinder Agreement dated February 15, 2023, by and between Debtor KO and the Lender (the "**KO Joinder**," and collectively with the Stoli Joinder, the "**Joinder Agreements**").

11.     Beginning on July 17, 2024, and subsequently on August 7, 2024, September 26, 2024, and October 21, 2024, the Lender served each of the Debtors with notices of default and reservation of rights letters, alleging and asserting ongoing defaults under the Stoli Loan Documents and KO Loan Documents, respectively (collectively, the "**Notices of Default**"). Following the Lender's serving the Debtors with the Notices of Default, the Debtors and the Lender engaged in extensive negotiations and discussions, both directly and through counsel.

12.     Additionally, on October 29, 2024, the Lender sent a total of ten (10) letters (the "**KO Vendor Letters**") to various trade vendors, suppliers, and storage providers utilized by KO (collectively, the "**KO Vendors**"), among other things, (a) informing the KO Vendors that KO was in default under the KO Loan Documents and that the Lender did not consent to any of KO's inventory currently held by the KO Vendors being sold, removed, transported, or otherwise disposed of by KO or anyone else without the Lender's prior written consent; and (b) demanding that the KO Vendors not acknowledge, facilitate, or undertake any further sales, removal, transportation or other disposition of any KO inventory held by the KO Vendors without the Lender's prior written consent.

13.     Thereafter, on November 13, 2024, the Lender served each of the Debtors with notices of default, acceleration, demand for repayment, and reservation of rights letters, alleging and asserting additional ongoing defaults and demanding repayment of all amounts owed by each of the Debtors, respectively, under the Stoli Loan Documents and KO Loan Documents (collectively, the "**Acceleration Notices**").

14.     The Debtors continued to engage in negotiations and discussions with the Lender, both directly and through counsel. The Debtors (1) retained Riveron Consulting, LLC ("**Riveron**") as the Debtors' restructuring and financial advisor and (2) appointed Steven Wybo of Riveron as the Debtors' Chief Restructuring Officer ("**CRO**"). The Debtors continued their negotiations and discussions with the Lender following Riveron's engagement and the CRO's appointment. However, the Debtors and the Lender were unable to reach a mutually agreeable resolution that would allow the Debtors to sustain their operations and provide the Debtors with sufficient time to secure financing from an alternative lender.

15.     As of the Petition Date, the Debtors' aggregate principal outstanding funded debt obligations under the Prepetition Loan Documents total approximately $78,374,334.30 (together with all interest, fees, costs, and charges accrued or accruing prior to, on, or after the Petition Date, if applicable, collectively, the "**Prepetition Indebtedness**"), all of which is due and owing under the Prepetition Loan Documents, comprised of (i) $41,033,893.58 under the Stoli Revolver and (ii) $37,340,440.72 under the KO Revolver.

16.     The Debtors admit, acknowledge, and do not dispute that, as security for repayment of the Prepetition Indebtedness, the Lender holds valid, senior, perfected, and enforceable liens (the "**Prepetition Liens**") in all of the collateral described in the various Prepetition Loan Documents, (collectively, the "**Prepetition Collateral**"). The Prepetition Collateral includes cash proceeds and other cash equivalents, and all cash and cash equivalent proceeds of the Prepetition Collateral, constituting cash collateral of the Debtors within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

17.     The Debtors admit, acknowledge, and do not dispute that the Prepetition Loan Documents are legally binding and enforceable obligations of each of the Debtors. The Prepetition Liens in, to, and against all of the Prepetition Collateral are valid, enforceable, and properly perfected and are not subject to avoidance under any state and federal law. The Debtors do not have any existing claims or causes of action against the Lender arising from the relationship between the Debtors and the Lender with respect to the Prepetition Loan Documents, the Prepetition Indebtedness, the Prepetition Liens, or the Prepetition Collateral.

**C.     The Subordinate Loan Documents**

18.     Debtor KO is also a borrower under that certain Loan Agreement, dated November 29, 2017, by and between Debtor KO and S.P.I. Worldwide Trade Limited, as successor to SPI Group S.a`r.l. (the "**Subordinate Lender**"), as from time to time amended,

supplemented, restated, or otherwise modified (the "**Subordinate Loan Documents**"), providing

for a delayed draw term loan of up to $25,000,000 (the "**Subordinate Loan**"). The Subordinate

Loan is unsecured, bears interest at a rate of 3% per annum, and all amounts borrowed under the

Subordinate Loan mature on December 31, 2027. As of the Petition Date, the Debtors owe

$6,151,299.00 under the Subordinate Loan Documents.

19.    Debtor KO, the Lender, and the Subordinate Lender entered into that certain

Amended and Restated Subordination Agreement on February 3, 2024 (the "**Subordination**

**Agreement**"), thereby subordinating the Subordinate Loan to the amounts owed by Debtor KO

under the KO Loan Documents.

## IV.
## RELIEF REQUESTED

20.    Pursuant to sections 105, 361, 362, and 363 of the Bankruptcy Code and

Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, the Debtors request the following:

   a.    authorization for the Debtors to (i) use Cash Collateral and all other
         Prepetition Collateral in accordance with the terms of the Interim Order
         and material compliance with the cash disbursements and receipts budget
         annexed thereto (as such budget may be modified from time to time with
         the prior written consent of the Lender, which consent shall not be
         unreasonably withheld, the "**Budget**"), and (ii) provide adequate
         protection to the Lender under the Prepetition Loan Documents;

   b.    that this Court hold an interim hearing on the Motion to consider the relief
         requested in this Motion and entry of the proposed Interim Order;

   c.    that this Court schedule a final hearing (the "**Final Hearing**") to consider
         entry of a final order (the "**Final Order**") granting the relief requested in
         this Motion on a final basis;

   d.    modification of the automatic stay imposed by section 362 of the
         Bankruptcy Code to the extent necessary to implement and effectuate the
         terms and provisions of the Interim Order and the Final Order;

   e.    waiver of any applicable stay with respect to the effectiveness and
         enforceability of the Interim Order or the Final Order (including, without

limitation, a waiver pursuant to Bankruptcy Rule 6004 and a waiver of the applicability of Bankruptcy Rule 4001(a)(3)); and

f.      that the Court grant such further and other relief as is just and proper.

## V.
## BASIS FOR RELIEF

### A.      Emergency Relief

21.     The Debtors bring this Motion on an emergency basis given the immediate and irreparable harm that the Debtors will potentially suffer if they are denied the ability to use Cash Collateral, which is necessary to sustain ongoing business operations and to preserve the value of their assets for the benefit of the Debtors' Estates, and to implement the Debtors' restructuring objectives. Absent the continued use of Cash Collateral, the Debtors would likely have to cease their ongoing operations to the material detriment of their employees, creditors, stakeholders, and other parties in interest. Therefore, the Debtors need to ensure the availability of such working capital now.

### B.      Adequate Protection and Cash Collateral

22.     Pursuant to Bankruptcy Code § 363(c)(2), a debtor-in-possession may not use cash collateral without the consent of the Lender or court approval. *See* 11 U.S.C. § 363(c)(2). Bankruptcy Code § 363(e) provides that, upon request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. *See* 11 U.S.C. § 363(e).

23.     The Bankruptcy Code does not expressly define "adequate protection" or proscribe a particular form that it must take. *See In re Las Torres Dev., L.L.C.,* 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the Bankruptcy Code "contains no specific, definitive definition of adequate protection") (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987)). Generally, courts decide what constitutes adequate protection on a case-by-case

basis. *See In re First S. Sav. Ass'n*, 820 F.2d at 710 (noting, with respect to adequate protection, that "'[i]ts application is left to the vagaries of each case'") (quoting *In re Becker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)); *Resolution Tr. Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.") (citing *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact specific inquiry."). The focus of the adequate protection requirement is to protect a "secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Central Park Avenue Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection . . . is to safeguard the secured creditor from diminution in the value of its interests"); *In re Beker*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the focus of adequate protection "is protection of the secure creditor from diminution in the value of its collateral during the reorganization process").

**C.    The Debtors' Proposed Adequate Protection for the Use of Cash Collateral**

24.    The Lender asserts liens on the Cash Collateral of the Debtors. As adequate protection for such Debtors' use of the Cash Collateral, the Debtors are proposing to provide the Lender with adequate protection via replacement liens and superpriority administrative claims for any diminution of value. Specifically, the Debtors will give the Lender valid and automatically perfected (without necessity of the execution of additional mortgages, security agreements, pledge agreements, financing statements, or other documents) replacement liens and security interests in all of the Debtors' assets, including, without limitation, all accounts and inventory acquired by the Debtors after the Petition Date, specifically including all cash proceeds arising from such accounts and inventory acquired by the Debtors after the Petition Date (but

excluding any causes of action under chapter 5 of the Bankruptcy Code) (the "**Adequate Protection Collateral**" and, together with the Prepetition Collateral, collectively, the "**Collateral**"), in the same nature, extent, priority, and validity that such liens existed on the Petition Date (the "**Replacement Liens**"). The Replacement Liens will secure the Lender to the extent necessary to adequately protect the Lender from any diminution in value of its interests in the property of the Debtors' Estates as a result of the use of Cash Collateral. Upon entry of the Final Order, the Replacement Liens, however, will be junior in priority and payment to the Carve Out (as defined below).

25.     To the extent the Replacement Liens granted to the Lender do not provide the Lender with adequate protection of its interests in the Cash Collateral, the Lender will have a super-priority administrative expense claim under Bankruptcy Code § 507(b) with priority over every other administrative claim of any kind (the "**Super-Priority Claims**"). Subject only to the Carve Out (as defined below) upon entry of the Final Order, the Super-Priority Claims of the Lender will have priority over all other administrative expenses incurred in this case of any kind, including such administrative expenses of the kinds specified in or allowable under sections 365(d)(3), 506(c), 507(a) or 507(b) of the Bankruptcy Code.

26.     The proposed Adequate Protection, outlined above and as set forth in the proposed Interim Order, is sufficient to secure the Debtors' projected use of Cash Collateral because the projected diminution in value, if any, from the use of Cash Collateral is less than the value of the Adequate Protection proposed to the Lender. Moreover, the use of Cash Collateral is itself a form of Adequate Protection by preserving or even increasing the value of the Debtors' overall going concern value by operating during the restructuring process. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (noting that, in determining whether protection is

"adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing) (citing *Bank of New England v. BWL, Inc.,* 121 B.R. 413, 418 (D. ME. 1990)).

**D.      The Use of Cash Collateral is Necessary to Preserve the Assets of the Estates**

27.      The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these Chapter 11 Cases and to preserve the value of their Estates for the benefit of all parties-in-interest. Substantially all of the Debtors' total cash on hand as of the Petition Date is subject to the liens of the Lender and thus constitutes Cash Collateral.

28.      The Debtors continue to incur expenses associated with the management of the Debtors' ongoing operations, the collection of receivables, and the administration of the Debtors' Estates during the course of these Chapter 11 Cases. It is essential that the Debtors continue to fund their ongoing operating expenses, payroll obligations, insurance expenses, and other obligations. The Debtors' ability to use Cash Collateral will allow the continuation of the Debtors' existing operations and lending relationships.

29.      Immediate access to Cash Collateral will restore the confidence of their vendors, customers, employees, and other stakeholders at this critical stage of their restructuring. Accordingly, the use of Cash Collateral in accordance with the terms of the Interim Order is essential to the Debtors' ability to minimize disruptions and avoid irreparable harm to their business.

**E.      The Carve Out is Appropriate**

30.      For purposes hereof and only upon entry of the Final Order, the "**Carve Out**" means, the sum of (i) all fees and expenses required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "**Statutory Fees**"); (ii) all

reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the

Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) to the extent

allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and

expenses accrued or incurred by persons or firms retained by the Debtors pursuant to section

327, 328, or 363 of the Bankruptcy Code (the foregoing, collectively, "**Professional Fees**")

before or on the first business day following delivery by the Lender of a written notice delivered

by email (or other electronic means) to the Debtors, their lead restructuring counsel, and the U.S.

Trustee, which notice may be delivered following the occurrence and during the continuation of

an Event of Default under the Interim Order stating that the Post-Carve-Out Trigger Notice Cap

(as defined below) has been invoked (the "**Carve-Out Trigger Notice**"); and (iv) Professional

Fees in an aggregate amount not to exceed $300,000.00 incurred after the first business day

following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any

time, whether by interim order, procedural order, or otherwise (the amounts set forth in this

clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"); provided that, nothing in the

interim shall be construed to impair the ability of any party to object to the fees, expenses,

reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

31.     On the day on which a Carve-Out Trigger Notice is given by the Lender as set

forth herein (the "**Termination Declaration Date**"), the Carve-Out Trigger Notice shall

constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of

such date and any available cash thereafter held by any Debtors to fund a reserve in an amount

equal to the then accrued and unpaid amounts of the Professional Fees. Notwithstanding

anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing

Prepetition Indebtedness, including the Replacement Liens and the Super-Priority Claims.

32.     The Carve Out is similar to other provisions of this type, which have been found to be reasonable and necessary to ensure that the Debtors' Estates and any statutory committee can retain assistance from counsel. *See In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Indeed, it has been the uniform practice of this Court . . . to insist on a carve out . . . in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.").

33.     Without the Carve Out, the Debtors' Estates and other parties-in-interest may be deprived of possible rights and powers because all of the Debtors' assets would be subject to prior security interests. *See In re Ames Dep't Stores Inc.*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out also protects against the possibility of administrative insolvency by ensuring that assets remain available for the payment of statutory and professional fees. Accordingly, the Court should approve the Carve Out.

**F.      The Automatic Stay Should be Modified to a Limited Extent**

34.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors and the Lender to perform the transactions and actions contemplated or permitted by the Interim Order.

35.     The stay relief provisions are a reasonable exercise of the Debtors' business judgment, are appropriate under the present circumstances, and, accordingly, should be approved.

**G.      Interim Relief is Warranted**

36.     Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion to use cash collateral may not be commenced before 14 days after service of the applicable motion. Fed. R.

Bankr. P. 4001. This Court may, however, conduct a preliminary hearing before the expiration of that fourteen-day period and likewise authorize the use of Cash Collateral, if necessary, to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *Id.*

37.     The Debtors and their Estates will suffer immediate and irreparable harm if the interim relief requested herein authorizing the Debtors to use the Cash Collateral is not granted promptly. The Debtors believe that the commencement of the Chapter 11 Cases has already and will continue to significantly increase the demands on their cash as a result of, among other things, the costs of administering the Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the Chapter 11 Cases. The Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

38.     The alternative, in this case, is "to force the debtor to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of all classes of creditors and other constituencies involved in this case." *In re Dynaco Corp.*, 162 B.R. 389, 396 (Bankr. D.N.H. 1993) (alteration in original). This result would be at fundamental odds to the rehabilitative purposes of chapter 11, therefore, approval of this Motion is warranted. Id. at 394 (noting that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible") (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

39.     In examining requests under Bankruptcy Rule 4001, courts apply the same business judgment standard applicable to other business decisions. *See In re Simasko Production*

*Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39–40
(Bankr. S.D. N.Y. 1990). The Debtors submit that, for the reasons set forth herein, the immediate
use of Cash Collateral, on an interim basis, as requested in this Motion, is necessary to avert
immediate and irreparable harm to the Debtors' businesses and their Estates. After the 14-day
period, however, the request for use of cash collateral is not limited to those amounts necessary
to prevent harm to the Debtors' business.

40.    The Debtors request that the Court conduct an emergency preliminary hearing on
the Motion and authorize the Debtors, from and after the entry of the Interim Order until a Final
Hearing on the relief requested herein, to use Cash Collateral, as necessary. Such authorization
will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable
harm and prejudice to their Estates and all parties in interest pending the Final Hearing.

41.    Accordingly, for all of the reasons set forth above, prompt entry of the Interim
Order is necessary to avert immediate and irreparable harm to the Debtors' Estates and is
consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**H.    Request for a Final Hearing**

42.    As noted above, pursuant to Bankruptcy Rules 4001(b)(2), the Debtors
respectfully request that the Court set a date for the Final Hearing at the earliest date and time of
the Court's convenience that will ensure adequate notice and due process to all parties-in-interest
to these Chapter 11 Cases.

43.    The Debtors respectfully request that they be authorized to serve a copy of the
signed Interim Order, which fixes the time and date for the filing of objections, if any, by first-
class mail on the Notice Parties (as defined below) and to any other party that has filed a request
for notices with this Court and to any official committee, or the legal counsel of any official
committee, if the same shall have filed a request for notice. The Debtors respectfully request that

the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy

Rule 4001.

## VI.
## BANKRUPTCY RULE 6003 HAS BEEN SATISFIED

44.    Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to

use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a

motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one

days after filing of the petition. Here, the Debtors believe an immediate and orderly transition

into chapter 11 is critical to the viability of their business operations. Any delay in granting the

relief requested could hinder the Debtors' business operations and cause irreparable harm to the

Debtors' Estates, thus threatening the Debtors' ability to reorganize successfully. Accordingly,

the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## VII.
## REQUESTS FOR BANKRUPTCY RULES 4001 AND 6004 WAIVERS

45.    The Debtors request a waiver of the notice requirements under Bankruptcy Rule

6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy

Rules 4001(a)(3) and 6004(h). As explained above and in the First Day Declaration, the relief

requested herein is necessary to avoid immediate and irreparable harm to the Debtors.

Accordingly, ample cause exists to justify the waiver of the notice requirements under

Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rules 4001(a)(3) and

6004(h), to the extent such stay applies.

## VIII.
## <u>NOTICE</u>

46.     No trustee, examiner, or statutory creditors' committee has been appointed in these Chapter 11 Cases. This Motion has been provided to (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors' secured lender and counsel to the Debtors' secured lender; (iii) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iv) the Internal Revenue Service; and (vi) all parties in interest who have formally appeared and requested notice. The Debtors respectfully submit that no further notice of this Motion is required.

47.     The pleadings in these Chapter 11 Cases and supporting papers are available on the Debtors' website at https://cases.stretto.com/Stoli or on the Bankruptcy Court's website at https://ecf.txnb.uscourts.gov/. You can request any pleading you need from (i) the proposed noticing agent at: Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, 855-469-2598 (toll-free), (TeamStoli@stretto.com) or (ii) proposed counsel for the Debtors at: Foley & Lardner LLP, c/o Stephen A. Jones, 2021 McKinney Avenue, Suite 1600, Dallas, Texas 75201 (sajones@foley.com)..

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court (i) grant the Motion and (ii) grant such other relief as the Court deems appropriate under the circumstances.

DATED: November 29, 2024

Respectfully submitted by:

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Stephen A. Jones (TX 24101270)
Mary Rofaeil (TX 24119467)
Zachary C. Zahn (TX 24137675)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
sajones@foley.com
mary.rofaeil@foley.com
zzahn@foley.com

-and-

Ann Marie Uetz (*pro hac vice* forthcoming)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone: (313) 234-7100
Facsimile: (313) 234-2800
auetz@foley.com

-and-

Michael J. Small (*pro hac vice* forthcoming)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654-4762
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
msmall@foley.com

**PROPOSED COUNSEL TO DEBTORS
AND DEBTORS IN POSSESSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2024, a true and correct copy of the foregoing document was served electronically by the Court's PACER system.

<u>/s/ Stephen A. Jones</u>
Stephen A. Jones