Brent R. McIlwain
Texas Bar No. 24013140
Christopher A. Bailey
Texas Bar No. 24104598
HOLLAND & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1700
Email: brent.mcilwain@hklaw.com
        chris.bailey@hklaw.com

Jeremy M. Downs (admitted *pro hac vice*)
Illinois Bar No. 6272155
William C. Meyers (admitted *pro hac vice*)
Illinois Bar No. 6195666
Steven J. Wickman (admitted *pro hac vice*)
Illinois Bar No. 6342929
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: 312.201.4000
Email: jeremy.downs@goldbergkohn.com
        william.meyers@goldbergkohn.com
        steven.wickman@goldbergkohn.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Stoli Group (USA), LLC, *et al.*,[1] | § | Case No.: 24-80146-swe11 |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**FIFTH THIRD BANK, NATIONAL ASSOCIATION'S OBJECTION TO (I) CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTORS AND THE PLAN SPONSOR AND (II) APPROVAL OF THE FIRST AMENDED DISCLOSURE STATEMENT RELATING TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE <u>DEBTORS AND THE PLAN SPONSOR</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal identification number, are Stoli Group (USA), LLC (5602) ("<u>Stoli USA</u>") and Kentucky Owl, LLC (3826) ("<u>Kentucky Owl</u>").

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................... 1

SPECIFIC PLAN OBJECTIONS ................................................................................. 3

    I.       The Plan Fails to Satisfy Section 1123(a)(1) of the Bankruptcy Code by Failing to Classify the Unsecured Claim of the Senior Lender that Would Result from the Debtors' Abandonment of the Liquidating Collateral. ..................................... 3

    II.     The Plan Fails to Satisfy Section 1123(a)(5) of the Bankruptcy Code Because it Lacks Adequate Means for Implementing a Surrender and Monetization of the Liquidating Collateral. ..................................................................................... 4

    III.    The Plan Violates Section 510(a) of the Bankruptcy Code Because It Would Allocate Certain of Senior Lender's Collateral to Bardstown Bourbon Company, Contrary to the Prepetition Subordination Agreement Between Bardstown Bourbon Company and Senior Lender. ............................................... 5

    IV.    The Plan Fails under Section 1129(a)(2) of the Bankruptcy Code Because the Debtors Have Materially Failed to Comply with Applicable Provisions of Chapter 11, to the Detriment of Senior Lender, While Trying to Achieve Their Plan. ...................................................................................................................... 7

    V.     The Plan Fails to Satisfy Section 1129(a)(5) of the Bankruptcy Code by Failing to Disclose the Identities and Affiliations of the Directors, Officers or Trustees of the Reorganized Debtors and Plan Sponsor. ..................................................... 10

    VI.    The Plan Fails to Satisfy Section 1129(a)(7) of the Bankruptcy Code Because the Senior Lender May be Oversecured Even in a Chapter 7 Liquidation and, in All Events, Would Fare Better in a Chapter 7 Liquidation Than Under the Plan. ................................................................................................................... 11

    VII.   The Plan Fails to Satisfy the Requirements of Section 1129(a)(11) of the Bankruptcy Code Because the Assumptions in the Plan's Post-Confirmation Financial Projections are Speculative and Not Supported by Any Underlying Data or Evidence and, Even If One Takes the Plan's Projections at Face Value, Stoli USA Will Likely Not Have Enough Liquidity to Continue Operating as a Going Concern Because the Assumptions are Patently Unreasonable Based on Reasonable Assumptions. ..................................................................................... 14

    VIII.  The Plan is Not Fair and Equitable Under Section 1129(b)(2)(A) of the Bankruptcy Code with Respect to the Senior Lender's Secured Claim Because, Among Other Things, It Strips the Senior Lender of Liens and Fails to Provide for the Realization by Senior Lender of the Indubitable Equivalent of its Secured Claims. .......................................................................................................... 17

          A.    *Sandy Ridge* is Distinguishable and Inapplicable ....................................... 18

B.      The Plan Fails to Satisfy the Indubitable Equivalent Requirement
        Because It Improperly Ascribes Fair Market Values to the Liquidating
        Collateral in Contravention of *Rash*, *Houston*, and the Plain Meaning of
        Section 506(a) of the Bankruptcy Code, Jeopardizing Repayment of
        Senior Lender's Secured Claim in Contravention of Established Case
        Law. ..........................................................................................................18

C.      The Plan Fails to Satisfy the Indubitable Equivalent Requirement
        Because It Does Not Contemplate Payment to Senior Lender of
        Amounts Allowed by Bankruptcy Code Section 506(b) on the Debt that
        the Plan Associates with the Liquidating Collateral. ..................................20

D.      The Debtors Want to Reduce the Indubitable Equivalence Standard to a
        Valuation Exercise and Ignore the Resulting Harm to Senior Lender's
        Existing Secured Claim..............................................................................21

RESERVATION OF RIGHTS ................................................................................. 23

CONCLUSION......................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Assoc's Com. Corp. v. Rash*,
   520 U.S. 953 (1997) ................................................................................................ *passim*

*Cothran v. United States*,
   45 B.R. 836 (S.D. Ga. 1984) ................................................................................... 10

*In re Arnold & Baker Farms*,
   177 B.R. 648 (B.A.P. 9th Cir. 1994) ...................................................................... 19

*In re Cantu*,
   398 Fed. Appx. 76 (5th Cir. 2010) .................................................................... 15, 16

*In re CRB Partners, LLC*,
   No. 11-11915, 2013 WL 796566 (Bankr. W.D. Tex. Mar. 4, 2013)........................ 21

*In re Fleming*,
   No. 17-19513, 2020 WL 1170722 (B.A.P. 9th Cir. Mar. 10, 2020) ........................ 21

*In re Greystone III Joint Venture*,
   995 F.2d 1274 (5th Cir. 1991) ................................................................................. 4

*In re Houston Reg'l Sports Net., L.P.*,
   886 F.3d 523 (5th Cir. 2018) ............................................................................. *passim*

*In re Idearc Inc.*,
   423 B.R. 138 (Bankr. N.D. Tex. 2009) .................................................................. 15

*In re Mid Pac. Airlines, Inc.*,
   110 B.R. 489 (Bankr. D. Haw. 1990) ..................................................................... 11

*In re Residential Cap., LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013) ................................................................... 12

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y. 2016) ................................................................... 12

*In re Sandy Ridge Dev. Corp.*,
   881 F.2d 1346 (5th Cir. 1989) ........................................................................... 17, 18

*In re SCC Kyle Partners, Ltd.*,
   518 B.R. 393 (W.D. Tex. 2014) ............................................................................. 15

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ................................................................... 15

*In re Walat Farms, Inc.*,
  70 B.R. 330 (Bankr. E.D. Mich. 1987) ..................................................... 19

*United Savs. Ass'n v. Timbers of Inwood Forest, Ltd.*,
  484 U.S. 365 (1988) ........................................................................... 19, 20

## **Statutes**

11 U.S.C. § 506(a) ........................................................................... *passim*
11 U.S.C. § 506(a)(1) ....................................................................... 11, 12, 13
11 U.S.C. § 506(b) ............................................................................. 17, 20
11 U.S.C. § 510(a) ............................................................................... 5, 6
11 U.S.C. § 1123(a)(1) .......................................................................... 3, 4
11 U.S.C. § 1123(a)(5) ............................................................................. 4
11 U.S.C. § 1129(a)(2) .......................................................................... 7, 10
11 U.S.C. § 1129(a)(5) ......................................................................... 10, 11
11 U.S.C. § 1129(a)(7) ......................................................................... 11, 14
11 U.S.C. § 1129(b)(1) ............................................................................ 4
11 U.S.C. § 1129(b)(2)(A)(iii) ......................................................... 17, 18, 19, 20
11 U.S.C. § 1129(b)(2)(B) ........................................................................ 4

Fifth Third Bank, National Association, as senior secured lender (the "Senior Lender"), by its undersigned counsel, files this objection (the "Objection") to (i) confirmation of the *First Amended Joint Chapter 11 Plan of Reorganization of the Debtors and the Plan Sponsor* (Docket No. 580, the "Plan")[2] and (ii) approval of the *First Amended Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of the Debtors and the Plan Sponsor* (Docket No. 581, the "Disclosure Statement"). In support of its Objection, Senior Lender respectfully states as follows:

### PRELIMINARY STATEMENT

1.    The Plan fails to meet numerous confirmation requirements and must be denied. Through the Plan, the Debtors and the Plan Sponsor propose to turn several of the Senior Lender's rights on their head and the secured lending industry along with them.  This would be all to benefit the Debtors' equity owners, who also own the Plan Sponsor and substantially all of the companies that produce inventory for Stoli USA.   The Court can and should put an end to this misguided and costly effort by denying the Plan.  That is the only way these Chapter 11 Cases can move towards an appropriate resolution.

2.    The most egregious shortcomings of the Plan are its failures to satisfy the best interests and feasibility tests, while marshaling and stripping liens from the Senior Lender under the guise of indubitable equivalence.  These features would work together to leave the Senior Lender with a large unpaid deficiency.  In this way, the Plan seeks to erase (without payment) tens of millions of dollars of secured debt owed to the Senior Lender while junior unsecured creditors are paid in full and equity retains ownership of the Debtors for a *de minimis* effective date contribution.  For these reasons, the Plan is absurd.

---

[2] Unless otherwise indicated, capitalized terms used as defined terms herein have the meanings given thereto in the Plan.

3.      Prompt denial of the Plan and such flawed premises is not only required by law, but it is also exactly what these Chapter 11 Cases need.  For months, the Debtors (a) have alleged an intent to pay the Senior Lender in full (but propose the opposite in the Plan), (b) have refused to sell inventory that they do not need (which could have reduced debts and interest), (c) have failed to replace their recordkeeping system (but chafe at Senior Lender's complaints about insufficient reporting and discovery responses), and (d) have expressed a desire to reorganize (yet propose a Plan that is patently unconfirmable and only causing expensive delay).  These Chapter 11 Cases need the Court to deny the Plan to force the Debtors and their ownership to take bankruptcy law seriously.  The Senior Lender has repeatedly tried to find cash collateral compromises with the Debtors, in hopes of negotiating a final result to these Chapter 11 Cases. However, this Plan contest stems from the fact that the Debtors' owners remain unwilling to *actually* pay the Senior Lender's secured claim in full as the Bankruptcy Code requires.  These Chapter 11 Cases need the Court to dissuade the Debtors' owners of the idea that they can line their pockets with future profits gained by stiffing the Debtors' senior secured creditor.  Absent that, these Chapter 11 Cases will continue to be highly litigious.

4.      What the Senior Lender respectfully and specifically requests from the Court is as follows: (i) deny the Plan; and (ii) order the appointment of a chapter 11 trustee for these Debtors effective as of August 29, 2025 (the expiration date of the current cash collateral order), unless the Debtors have gained the Senior Lender's acceptance of an amended plan.  The Debtors' ownership has clearly demonstrated an inability or unwillingness to bring these Chapter 11 Cases to an effective conclusion.  Accordingly, if an immediately confirmable Plan cannot be proposed on this basis, then the Chapter 11 Cases need to be taken over by an independent fiduciary.

<u>**SPECIFIC PLAN OBJECTIONS**</u>

I.    **The Plan Fails to Satisfy Section 1123(a)(1) of the Bankruptcy Code by Failing to Classify the Unsecured Claim of the Senior Lender that Would Result from the Debtors' Abandonment of the Liquidating Collateral.**

5.    The Plan fails to meet the requirement of section 1123(a)(1) of the Bankruptcy Code because it fails to classify all of the Senior Lender's claim.

6.    Section 1123(a)(1) of the Bankruptcy Code provides:

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall:

(1) designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests[.]

11 U.S.C. § 1123(a)(1).

7.    The "GUC Excluded Claims" definition in the Plan operates to specifically exclude all claims of the Senior Lender from the definition of "GUC Claims" and, therefore, coverage by Class 5. Class 4 under the Plan only pertains to the Senior Lender's "Secured Claim." A Secured Claim under the Plan is definitionally limited "to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code." As more fully described below, the Debtors' proposed abandonment of the Senior Lender's collateral described on Exhibits B and C to the Plan Supplement (collectively, the "<u>Liquidating Collateral</u>") would likely result in the Senior Lender realizing barely more than $20 million from such Liquidating Collateral. This is principally driven by the weakness of the raw bourbon market and the Debtors' prohibition of selling finished goods Liquidating Collateral to distribution customers within the United States. As a result, Senior Lender would still be owed over $60 million by the Debtors, which is far more than their remaining assets and operations can support if the Debtors' large claims against the Plan Sponsor and other affiliates are also being released or compromised under the Plan. Yet, the Plan

fails to classify (much less appropriately treat) the unsecured claim of the Senior Lender that the

Plan would create.

8.      This (mis)treatment of Senior Lender's unsecured deficiency claim under the Plan

not only violates section 1123(a)(1) of the Bankruptcy Code, it also violates sections 1129(b)(1)

and 1129(b)(2)(B) of the Bankruptcy Code on account of the fact that the Debtors' equity holder

would receive a recovery under the Plan before Senior Lender's unsecured deficiency claim is

satisfied in full, violating the "absolute priority rule." *See In re Greystone III Joint Venture*, 995

F.2d 1274, 1282 (5th Cir. 1991) ("This 'absolute priority rule' is codified at 11 U.S.C. §

1129(b)(2)(B) as a definition of the 'fair and equitable' standard for plan confirmation. Thus, the

holder of any claim or interest that is junior to the claims of an unsecured class may not receive *any*

*property* on account of its claim or interest until the senior claims are repaid in full."). 

Furthermore, even if a plan construction that classified the Senior Lender's Secured Claim as

having an unsecured component was legitimate, the Plan fails to reflect any process or valuation

to demonstrate that the small cash contribution that the Plan Sponsor might make on the Effective

Date (nothing is committed) is sufficient to justify allowing current equity owners to retain their

interests while the Senior Lender's deficiency claim is not paid like the other GUC Claims.  *See*

*id.* at 1284 ("Neither in the Code's language, nor in the context of a previous, different

reorganization law, nor in legislative history, nor in policy is there room for a 'new value

exception' to the absolute priority rule now defined by § 1129(b)(2)(B).").

## II.    The Plan Fails to Satisfy Section 1123(a)(5) of the Bankruptcy Code Because it Lacks Adequate Means for Implementing a Surrender and Monetization of the Liquidating Collateral.

9.      The Plan fails to meet the requirement of section 1123(a)(5) of the Bankruptcy

Code because it lacks adequate means for the plan's implementation as it relates to the Senior

Lender's Secured Claim.  Class 4 of the Plan provides that the Liquidating Collateral will either

-4-

be surrendered to the Senior Lender, or controlled by the "SPV Operating Agreement" to which the Debtors and Senior Lender would be party.  "Option 2" of Class 4 of the Plan (control by the SPV Operating Agreement) is only applicable if an agreement is reached between the Debtors and Senior Lender, and no such agreement exists.  This means that the Liquidating Collateral would be surrendered nakedly to Senior Lender.  More specifically, the Debtors propose to abandon the Liquidating Collateral without addressing: (a) who would own the Liquidating Collateral, (b) how the Liquidating Collateral could be physically accessed, (c) who retains the Debtors' rights to store the Liquidating Collateral, (d) how the Liquidating Collateral could be moved to alternative locations, (e) how the Liquidating Collateral could legally be sold (*e.g.*, raw and finished goods), (f) who holds the licenses and other regulatory rights to own and sell the Liquidating Collateral, (g) where are and who would control the Debtors' records regarding their title to the Liquidating Collateral and related information to share with buyers, storage locations, governmental units and other interested parties, and (h) what portion of the Liquidating Collateral would the Senior Lender receive in relation to the portion of the same Liquidating Collateral that Class 3 of the Plan allocates to another creditor.  In short, the Plan proposes that the Court satisfy over $60 million of the Senior Lender's debt with the Liquidating Collateral while failing to describe what specific Liquidating Collateral is being surrendered to the Senior Lender and providing no reasonable way for the Senior Lender to dispose of the Liquidating Collateral.

**III.   The Plan Violates Section 510(a) of the Bankruptcy Code Because It Would Allocate Certain of Senior Lender's Collateral to Bardstown Bourbon Company, Contrary to the Prepetition Subordination Agreement Between Bardstown Bourbon Company and Senior Lender.**

10.     The Plan violates section 510(a) of the Bankruptcy Code because it proposes to transfer some of the Liquidating Collateral to The Bardstown Bourbon Company, LLC ("Bardstown Bourbon Company"), a junior secured creditor, in contravention of the subordination

provisions contained in that certain Bailee Agreement between Senior Lender, Kentucky Owl, and

Bardstown Bourbon Company, dated as of February 3, 2023 (the "<u>Bailee Agreement</u>").

 11. Section 510(a) of the Bankruptcy Code provides:

> A subordination agreement is enforceable in a case under this title
> to the same extent that such agreement is enforceable under
> applicable nonbankruptcy law.

11 U.S.C. § 510(a).

 12. Section 1(a)(iii) of the Bailee Agreement provides:

> (iii) notwithstanding any agreement between Borrower or Bailee,
> Bailee's rights, security interests or property interests, including any
> warehouseman's liens for Borrower's non-payment, in the
> Materials, shall be subordinated to any security or like interests of
> Agent.

Bailee Agreement at 1.

 13. The terms of the Bailee Agreement are clear: notwithstanding *any agreement* (*i.e.*,

the Plan), Bardstown Bourbon Company's rights, security interests or property interests, including

any warehouseman's liens, *shall be subordinated* to any security or like interests of Agent (*i.e.*,

Senior Lender). Section 510(a)'s mandate is clear: subordination agreements like the one between

Bardstown Bourbon Company and Senior Lender are enforceable. Nothing about these Chapter

11 Cases has altered the fundamental nature of the Bailee Agreement—Senior Lender has a senior

lien on Kentucky Owl's collateral, and Bardstown Bourbon Company has a junior lien. Kentucky

Owl acknowledged and agreed to such priority prepetition and in the Cash Collateral Orders

entered in these Chapter 11 Cases. Therefore, the Court must enforce the subordination provisions

of the Bailee Agreement and reject the Debtors' attempt to sidestep both the valid and enforceable

Bailee Agreement and section 510(a) of the Bankruptcy Code.

**IV.    The Plan Fails under Section 1129(a)(2) of the Bankruptcy Code Because the Debtors Have Materially Failed to Comply with Applicable Provisions of Chapter 11, to the Detriment of Senior Lender, While Trying to Achieve Their Plan.**

14.    The Plan does not meet the requirement of section 1129(a)(2) of the Bankruptcy Code because Stoli USA has intentionally used the Debtors' cash collateral and inventory to benefit the Plan Sponsor and other affiliated insiders during these Chapter 11 Cases in violation of the Court's Cash Collateral Orders and the Bankruptcy Code, while withholding material facts about affiliate transactions to mislead parties during live testimony.

15.    Such misconduct occurred on at least three occasions and have been the subject of prior proceedings in these Chapter 11 Cases.  First, the Debtors allegedly prepaid the Plan Sponsor approximately $1.8 million for postpetition shipments of inventory at the outset of these Chapter 11 Cases because the Plan Sponsor had insufficient liquidity to continue production.  The Debtors' own testimony and records strongly suggest that such payments were not prepayments.  Instead, the evidence reflects that the Debtors were more likely intending to make payments on prepetition debt owed to the Plan Sponsor at the time. Even if such amounts were prepayments to the Plan Sponsor, the *Final Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection to Fifth Third Bank, National Association* (Docket No. 188, as amended, supplemented, modified or otherwise further stipulated, the "<u>Final Cash Collateral Order</u>") did not permit prepayments for goods and the Senior Lender did not consent to them.  Paragraph 4 of the Final Cash Collateral Order only permits payments to the Plan Sponsor "to the extent of the value of goods actually delivered to or for the benefit of the Debtors after the commencement of these Chapter 11 Cases."  Final Cash Collateral Order ¶ 4. Prepayments, by definition, are paid before the applicable goods have been delivered.  During prior testimony in these cases, the Debtors tried to suggest that because they subsequently received enough product from the Plan Sponsor to cover the prepayments, the prepayments were not a problem.  This position simply ignored the impact

of the payments on the Senior Lender's collateral position. Regardless, the Debtors were wrong to make any payments to the Plan Sponsor for product that had not yet been received, because they violated the Final Cash Collateral Order.

16.     The second instance, of which the Court became well aware, was when the Debtors' equity owners caused one of the Debtors' non-debtor affiliates (Louisiana Spirits, LLC) to ship nearly $800,000 of Kentucky Owl's finished goods (*i.e.*, Maighstir bourbon) to Stoli USA in consideration of over $700,000 of cash collateral paid to Louisiana Spirits, LLC.  Essentially, the Debtors' owners moved the Senior Lender's collateral from one place to another to justify sending cash collateral to a non-debtor affiliate for no value.  After pursuing an answer for weeks, the Senior Lender confronted the Chief Executive Officer of the Debtors' foreign parent company (Mr. Christopher Caldwell) about the transfers during a contested cash collateral hearing.  With encouragement from the Court, Mr. Caldwell eventually explained that the situation resulted from "human error" and that the payments should have gone to Kentucky Owl and not Louisiana Spirits, LLC.  However, the Final Cash Collateral Order did not permit any payments to Kentucky Owl for products such as Maighstir.  *See* Final Cash Collateral Order ¶ 4**.** The Final Cash Collateral Order contains a finite list of affiliates from whom the Debtors can make purchases, and neither of the Debtors themselves are included in that list.  *Id.*  Furthermore, Mr. Caldwell testified that Stoli USA needed to sell through the Maighstir bourbon to make way for a new product launch that was upcoming. Since that time, Stoli USA has not sold any Maighstir bourbon, and virtually all of the Maighstir it received from Louisiana Spirits, LLC is now listed among the Liquidating Collateral that the Debtors propose to abandon.  Stoli USA clearly had no use for the Maighstir bourbon it received.  Both the "sale" of the Maighstir bourbon and the excuses given for it appear to have been a sham.

17.    Lastly, during the contested cash collateral hearing on June 16, 2025, the Debtors sought to use $800,000 of cash collateral that was allegedly needed for shipments by the Plan Sponsor to Stoli USA.  Mr. Caldwell testified that the Plan Sponsor needed money from Stoli USA so that the Plan Sponsor could pay for and, therefore, become the owner of the inventory before it could be lawfully loaded on a transport ship.  The Senior Lender has since come to understand a very important fact that Mr. Caldwell left out of his testimony:  the company that the Plan Sponsor allegedly needed to pay was also a foreign affiliate of the Debtors, called AS Amber Latvijas Balzams ("Amber Latvia").  Amber Latvia is also 100% owned by the company for whom Mr. Caldwell was CEO, just like the Debtors.  The Plan Sponsor does not manufacture or otherwise produce any of Stoli USA's inventory; the Plan Sponsor is merely a pass-through or trading company.  Recently, the Debtors produced the supply agreement between Amber Latvia and the Plan Sponsor, which provides credit terms on shipments of the inventory that the Plan Sponsor passes-through to Stoli USA.  Yet, Mr. Caldwell used his testimony to create the false appearance of an emergency that he did not control to keep product flowing to Stoli USA.  He conveniently left out the fact that he was also the ultimate decision-maker for Amber Latvia who was allegedly not agreeing to release inventory to the Plan Sponsor (that Mr. Caldwell also controlled). Undoubtedly, the Debtors have tried to manipulate this process to keep money flowing to the Plan Sponsor and other non-debtor affiliates, rather than require the trade credit those affiliates are contractually obligated to provide.  The Debtors have used the stale refrain of a cyberattack over a year ago to hide activities and frustrate parties like the Senior Lender who may try to closely monitor such movement of cash and inventory.  Now at the Plan-stage, they ask the Court to ignore this misconduct and the advantage taken of the Senior Lender, so they can continue to try to abuse the Senior Lender's rights under the Plan.  The Debtors' failings in this regard were repeated,

substantial and intentional.  The Court should not allow the Debtors to advance their Plan when the party who suffered the direct damage of these acts (the Senior Lender) is objecting to the Plan. *See Cothran v. United States*, 45 B.R. 836 (S.D. Ga. 1984) (affirming the bankruptcy court's denial of confirmation of a chapter 11 plan of reorganization in part because the debtors used cash collateral without the court's permission in contravention of section 363(c)(2) of the Bankruptcy Code, which in turn violated the confirmation requirement contained in section 1129(a)(2) of the Bankruptcy Code).

## V. The Plan Fails to Satisfy Section 1129(a)(5) of the Bankruptcy Code by Failing to Disclose the Identities and Affiliations of the Directors, Officers or Trustees of the Reorganized Debtors and Plan Sponsor.

18.    The Plan fails to satisfy section 1129(a)(5) of the Bankruptcy Code because it fails to disclose the identities and affiliations of post-confirmation governance of the Debtors and Plan Sponsor.

19.    Section 1129(a)(5) of the Bankruptcy Code provides:

The court shall confirm a plan only if all of the following requirements are met:

(A)

(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. § 1129(a)(5).

20.     The Plan and Disclosure Statement fail to list the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors or Plan Sponsor. This omission alone fails to satisfy the disclosure requirements of section 1129(a)(5) of the Bankruptcy Code. *See In re Mid Pac. Airlines, Inc.*, 110 B.R. 489, 491 (Bankr. D. Haw. 1990) (holding that the failure of a chapter 11 plan to disclose names of individuals proposed to serve as officers and directors of debtor after confirmation precluded confirmation of plan). As such, due to the Debtors' failure to satisfy the requirements of section 1129(a)(5) of the Bankruptcy Code given the nondisclosure of the identities and affiliations of their post-confirmation directors and/or officers, the Court must deny confirmation of the Plan.

**VI.     The Plan Fails to Satisfy Section 1129(a)(7) of the Bankruptcy Code Because the Senior Lender May be Oversecured Even in a Chapter 7 Liquidation and, in All Events, Would Fare Better in a Chapter 7 Liquidation Than Under the Plan.**

21.     The Plan is fatally flawed because it seeks to assign fair market values to the Liquidating Collateral in contravention of section 506(a)(1) of the Bankruptcy Code. The Debtors do this because they want to "deem" over $60 million of the Senior Lender's debt repaid but not actually pay it. This is the only way that they can allege that the "best interests" test of section 1129(a)(7) of the Bankruptcy Code is satisfied by their Plan. However, such an approach to valuing the Liquidating Collateral completely misses the mark.

22.     Section 506(a)(1) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the *proposed disposition or use of such property*, and in conjunction with any

-11-

> hearing on such disposition or use or on a plan affecting such
> creditor's interest.

11 U.S.C. § 506(a)(1) (emphasis added).

23.     In *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) ("*Rash*"), the

Supreme Court considered the proper application of section 506(a) of the Bankruptcy Code to a

cramdown, where the debtor proposed to continue to use a truck which was the creditor's

collateral. Focusing on the words "[s]uch value shall be determined in light of the purpose of the

valuation and of the proposed disposition or use of such property," *id.* at 954, the Court held that,

where the debtor intended to use the truck and would have to replace it if the secured creditor

foreclosed, the proposed use required the collateral to be valued for cramdown purposes at its

replacement value, not its foreclosure value.  *Id.* at 965.

24.     Similarly, in *In re Houston Regional Sports Network, L.P.*, 886 F.3d 523, 533-34

(5th Cir. 2018) ("*Houston*"), the Fifth Circuit held that the bankruptcy court's valuation of the

secured creditor's collateral was erroneous because, contrary to *Rash*, it applied a hypothetical

liquidation value, when the intended disposition was a reorganization. Likewise, courts in other

circuits have recognized that, in assessing adequate protection in particular, "the proper valuation

methodology must account for the proposed disposition of the collateral," and where the proposed

disposition is a going concern sale, not a foreclosure, the secured creditor's collateral must be

valued at going concern value as of the petition date. *In re Residential Cap., LLC*, 501 B.R. 549,

593-94 (Bankr. S.D.N.Y. 2013); *see also In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 577-578

(Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ("In selecting a methodology for

valuing the proposed disposition of the collateral . . . [n]either the Debtors nor the lenders have

ever indicated that the outcome of these cases would be a foreclosure sale by the secured lenders .

. . [a]ccordingly, as in *ResCap*, the Court finds that a going concern or fair market valuation is the

appropriate methodology for valuing the interests of the [lenders] in the prepetition collateral as of the Petition Date.").

26.    Here, the Plan's proposed disposition of the Liquidating Collateral constitutes the inverse of the circumstances presented in *Rash* and *Houston,* in that the Debtors have proposed to surrender or abandon the Liquidating Collateral to Senior Lender rather than use it in furtherance of their reorganization and going concern operations.  Instead, the Plan would require the Senior Lender to attempt to sell the Liquidating Collateral as soon as reasonably possible. Senior Lender is not a liquor broker or an investor in the liquor market; the Senior Lender is a bank seeking to recover its loans as soon as reasonably possible.   Where the Debtors expressly propose to abandon the Liquidating Collateral so that the Senior Lender can liquidate it, it would be antithetical to the holdings in *Rash* and *Houston* to ascribe anything but a liquidation valuation to the Liquidating Collateral under the Plan. Section 506(a)(1) of the Bankruptcy Code is also clear: valuation of collateral should, first and foremost, consider the "proposed disposition or use" of the collateral in question. The Debtors cannot have their cake and eat it too – *i.e.*, they propose abandonment and liquidation of the Liquidating Collateral but value it as if it remained in the Debtors' hands and part of a going-concern.   The Bankruptcy Code and applicable case law clearly prohibit the "deemed" Liquidating Collateral values that the Plan proposes.

26.    When section 506(a) of the Bankruptcy Code is properly considered, the value of the Liquidating Collateral makes the Plan unconfirmable.  As the Senior Lender's restructuring expert will testify, the Senior Lender should realize far more on its Secured Claim in a chapter 7 liquidation than it would under the Plan.  Moreover, the Senior Lender might still be oversecured even in a chapter 7 liquidation of both Debtors if the Plan Sponsor and the Debtors' other affiliates honor their debts to the Debtors.  The amounts that the Plan Sponsor and other affiliates owe the

Debtors are sufficiently large to overcome the loss in recovery value that would result from Stoli USA going out of business.  At least for purposes of assessing the Plan's satisfaction of section 1129(a)(7) of the Bankruptcy Code, the Court should consider all of the debts owed by the Plan Sponsor to the Debtors valid and collectable.  The Debtors and Plan Sponsor should not be allowed to assume what they did in their liquidation analysis: that the Plan Sponsor will refuse to pay what it would owe the Debtors.  That would allow the Plan Sponsor to try to take advantage of these Chapter 11 Cases but not accept their burdens.  The Debtors' audited financials and monthly operating reports confirm that the Plan Sponsor owes over $40 million to the Debtors.  The Plan Sponsor should not be allowed to disclaim this liability while seeking to confirm the Plan under which it will directly benefit.  Whether or not the Plan Sponsor actually pays the debts it owes these estates in a liquidation does not change the fact that the Plan fails to satisfy section 1129(a)(7) of the Bankruptcy Code.  But, if the Debtors assume the Plan Sponsor can meet its large commitments to Stoli USA under the Plan, then they must also assume the Plan Sponsor can pay the over $40 million debt to the Debtors in a liquidation.

**VII.  The Plan Fails to Satisfy the Requirements of Section 1129(a)(11) of the Bankruptcy Code Because the Assumptions in the Plan's Post-Confirmation Financial Projections are Speculative and Not Supported by Any Underlying Data or Evidence and, Even If One Takes the Plan's Projections at Face Value, Stoli USA Will Likely Not Have Enough Liquidity to Continue Operating as a Going Concern Because the Assumptions are Patently Unreasonable Based on Reasonable Assumptions.**

27.     The Plan fails to satisfy the requirements of section 1129(a)(11) of the Bankruptcy Code because (i) the assumptions underlying Stoli USA's post-confirmation financial projections are speculative and unsupported by any factual data or detail whatsoever and (ii) even under Stoli USA's lofty, best-case scenario in its post-confirmation financial projections, it will likely not have enough liquidity to continue operating as a going concern because the assumptions contained therein are patently unreasonable.

-14-

28.     Section 1129(a)(11) of the Bankruptcy Code provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

[…]

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).

29.     Section 1129(a)(11) of the Bankruptcy Code, commonly known as the "feasibility requirement," requires that a plan offer reasonable assurance, probability, or prospect of success. *In re Idearc Inc.*, 423 B.R. 138 (Bankr. N.D. Tex. 2009), *aff'd,* 662 F.3d 315 (5th Cir. 2011), *cert. denied,* 2012 WL 123546 (2012). To satisfy the feasibility requirement, a plan proponent must establish, by a preponderance of the evidence, that its plan offers a reasonable prospect of success and is workable. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790 (5th Cir. 1997); *In re SCC Kyle Partners, Ltd.*, 518 B.R. 393 (W.D. Tex. 2014) (holding that a plan proponent must show reasonable assurance of commercial viability). Furthermore, to be feasible, a plan "may not be speculative or be based on unreasonable assumptions." *In re Cantu*, 398 Fed. Appx. 76, 78 (5th Cir. 2010) ("*Cantu*").

30.     Here, the Plan is not feasible for no less than two (2) reasons. First, contrary to the Fifth Circuit's instruction in *Cantu*, the Plan's post-confirmation financial projections for Stoli USA are completely "speculative." Among other items, Senior Lender's Requests for Production of Documents to the Debtors sought all relevant documents relating to Stoli USA's projected post-confirmation performance and all underlying assumptions and calculations in connection therewith. Over a month later, and with only a handful of days left until the Combined Hearing,

the Debtors have not provided Senior Lender with *any* detail or calculations underlying Stoli

USA's post-confirmation financial projections. Without such underlying data, Stoli USA's post-

confirmation financial projections are purely speculative and unfounded in objective fact. Per

*Cantu*, the Debtors cannot meet their burden on feasibility by presenting a set of "speculative"

projections and nothing more.

31.     Second, and again contrary to the Fifth Circuit's holding in *Cantu*, Stoli USA's

financial projections are "based on unreasonable assumptions" given Stoli USA's historical

performance on at least two (2) key metrics. First, Stoli USA's projected depletion allowances are

unreasonably low compared to historical and recent performance. Depletion allowances are the

credits or offsets taken by Stoli USA's customers before paying their accounts receivable.  Most

often depletion allowances relate to marketing expenses incurred by such customers.  Stoli USA's

projected depletion allowances are at least 3.5% lower than what the Debtors should reasonably

expect.

32.     To illustrate the significance of a 3.5% variation in Stoli USA's projected depletion

allowances, per the Plan model, just a 3.5% increase in Stoli USA's depletion allowance would

likely translate into nearly $11 million of cash being wiped off Stoli USA's balance sheet through

the projected period.  The Debtors only project having $14.4 million of cash at the end of such

period.  As a result, even this relatively small projection error by the Debtors could result in the

Debtors not having enough cash liquidity to operate their businesses post-confirmation.  This issue

is more fully detailed in the report of the Senior Lender's financial expert.

33.     Likewise, Stoli USA's projected cost of goods sold (COGS) in its post-

confirmation projections are materially lower than what should be reasonably expected.  Stoli

USA's historical and recent COGS have been at least 5.4% higher than what the Debtors project

post-confirmation.  This factor would reduce the cash that the Debtors will have to meet their Plan

obligations by nearly another $10 million.  Especially if combined with the negative impact of the

Debtors' higher depletion allowances, the higher COGS will almost certainly cause Stoli USA to

run out of cash and fail again as a going-concern in the near future.  And, this outcome would be

true even if everything else about the Debtors' projections go at least as well as expected – which

is not a reasonable assumption for a company that, among other things, lacks a reliable record-

keeping system.

34.    In short, contrary to the feasibility standards of the Fifth Circuit, the Plan is both

"speculative" and "based on unreasonable assumptions" and, therefore, not confirmable.

**VIII.  The Plan is Not Fair and Equitable Under Section 1129(b)(2)(A) of the Bankruptcy
Code with Respect to the Senior Lender's Secured Claim Because, Among Other
Things, It Strips the Senior Lender of Liens and Fails to Provide for the Realization
by Senior Lender of the Indubitable Equivalent of its Secured Claims.**

35.    The Plan masquerades as a type of "dirt-for-debt" plan supported by cases like *In

re Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir. 1989) ("*Sandy Ridge*").  For several

reasons, the Plan does not come remotely close to providing the Senior Lender with the

"indubitable equivalent" of its Secured Claim that *Sandy Ridge* suggests is hypothetically possible.

First, several of the facts at issue in *Sandy Ridge* are completely distinguishable from the facts of

these Chapter 11 Cases. Second, the Plan would improperly deem the Senior Lender's Secured

Claim satisfied rather than applying values that relate to the actual proposed use of the Liquidating

Collateral under section 506(a) of the Bankruptcy Code. And, the Plan does not contemplate any

interest, fees or costs being allowed or paid to Senior Lender on the principal amount of its debt

associated with the Liquidating Collateral under the Plan, in contravention of section 506(b) of the

Bankruptcy Code and persuasive case law on the issue.

36.    Section 1129(b)(2)(A)(iii) of the Bankruptcy Code provides:

-17-

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> (A) With respect to a class of secured claims, the plan provides—

> […]

> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(iii).

### A. *Sandy Ridge* is Distinguishable and Inapplicable

37. The Debtors' reliance on *Sandy Ridge* is inapposite. *Sandy Ridge* involved a liquidating plan, the secured creditor was undersecured, the surrendered collateral (*i.e.*, real estate) was readily saleable, and the secured creditor received *all* of its collateral on account of its secured claim under section 1129(b)(2)(A)(iii) of the Bankruptcy Code. Moreover, the secured creditor in *Sandy Ridge* was allowed an unsecured claim for its deficiency that was classified under the plan. Here, the Senior Lender is presently oversecured, the Liquidating Collateral in the Senior Lender's hands is either not saleable or requires years to sell, the Senior Lender would not receive all of its Collateral under the Plan, and the Debtors are not liquidating. *Sandy Ridge* (and cases like it) do not support the Debtors' proposed treatment of the Senior Lender's Secured Claim. Quite the opposite is true.

### B. The Plan Fails to Satisfy the Indubitable Equivalent Requirement Because It Improperly Ascribes Fair Market Values to the Liquidating Collateral in Contravention of *Rash*, *Houston*, and the Plain Meaning of Section 506(a) of the Bankruptcy Code, Jeopardizing Repayment of Senior Lender's Secured Claim in Contravention of Established Case Law.

38. The Plan fails to satisfy the indubitable equivalent requirement because it would merely <u>deem</u> the Senior Lender's Secured Claim partially satisfied rather than using the actual value of the Liquidating Collateral based upon how it will be used, contrary to the Supreme Court's

and Fifth Circuit's instructions in *Rash* and *Houston*, respectively, as well as the plain meaning of section 506(a) of the Bankruptcy Code.  In fact, as noted *supra*, a "Secured Claim" under the Plan is definitionally limited "to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code." Given the fact that the Debtors have chosen to define a Secured Claim as such (which is correct) on the one hand, how could it possibly be reasonable to ascribe an approximately $60 million valuation to the Liquidating Collateral, which will not be used in any way, shape, or form in the Reorganized Debtors' respective enterprises or by another entity with the same capabilities and rights. The answer is simple: it is not, and it is inherently contradictory.

39.    Courts have routinely held that in order for the partial surrender of collateral to satisfy the indubitable equivalent of part of a secured creditor's claim, such partial collateral surrender must not jeopardize the principal balance of a secured creditor's claim. *See, e.g.*, *In re Arnold & Baker Farms*, 177 B.R. 648, 662 (B.A.P. 9th Cir. 1994), *aff'd,* 85 F.3d 1415 (9th Cir. 1996) ("[I]n order for a partial distribution to constitute the most 'indubitable equivalence,' the partial distribution must insure the safety of or prevent jeopardy to the principal."); *see also In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) (holding that if there is any doubt regarding whether the creditor will realize the full value of its claim, then the requirements of section 1129(b)(2)(A)(iii) of the Bankruptcy Code are not met).  In *United Savings Ass'n v. Timbers of Inwood Forest, Ltd.*, 484 U.S. 365 (1988) ("*Timbers*"), the Supreme Court analyzed the meaning of "indubitable equivalence" finding that "*Murel* used the words 'indubitable equivalence' with specific reference not to interest (which was assured), but to the jeopardized principal of the loan." *Id.* at 378.

40.     Here, the Debtors' proposal to deem Senior Lender's Secured Claim partially satisfied by the surrender of the Liquidating Collateral undoubtedly jeopardizes the repayment of the principal balance of Senior Lender's loan. Before *any* sales of the Liquidating Collateral would have taken place, the Plan would ascribe a "pie in the sky" value to the Liquidating Collateral. As already addressed *supra*, ascribing anything other than liquidation value to the Liquidating Collateral under the Plan is at odds with *Rash*, *Houston*, and the plain meaning of section 506(a) of the Bankruptcy Code. The Debtors have overinflated the value of the Liquidating Collateral, which would leave the Senior Lender with a massive deficiency on the principal amount of its Secured Claim. This risk of principal loss to the Senior Lender under the Plan is virtually guaranteed.  This is impermissible under section 1129(b)(2)(A)(iii) of the Bankruptcy Code and cases like *Timbers*. Because the Debtors have clearly put the principal balance of Senior Lender's loan in jeopardy by way of using an inappropriate and inflated fair market valuation methodology vis-à-vis the Liquidating Collateral, the Debtors have failed to satisfy the indubitable equivalent requirement under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**C.      The Plan Fails to Satisfy the Indubitable Equivalent Requirement Because It Does Not Contemplate Payment to Senior Lender of Amounts Allowed by Bankruptcy Code Section 506(b) on the Debt that the Plan Associates with the Liquidating Collateral.**

41.     The Plan also fails to satisfy the indubitable equivalent requirement because the Plan does not allow for the Senior Lender's interest, fees and costs that would arise in connection with the abandonment of the Liquidating Collateral to the Senior Lender.  In this way, the Plan would strip the Senior Lender of the right to be paid such amounts of its existing oversecured claim. Section 506(b) of the Bankruptcy Code expressly allows such interest, fees, costs and expenses to the Senior Lender in this case where, before giving effect to the Plan, the Senior Lender is oversecured.  *See* 11 U.S.C. § 506(b) (stating that, to the extent a creditor is oversecured, "there

shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."). The Senior Lender is clearly entitled to such amounts as part of any indubitable equivalent treatment of its secured claim, particularly with respect to slow-moving, illiquid collateral, that will take an extended period for anyone to sell, like the Liquidating Collateral. *See, e.g.*, *In re Fleming*, No. 17-19513, 2020 WL 1170722, at *6 (B.A.P. 9th Cir. Mar. 10, 2020) ("Interest is necessary to provide the secured creditor with the value, as of the effective date, of its allowed secured claim. Transfer of the Landing Lots as 'payment,' does not compensate HLI for the approximately five years needed to sell the lots, a time period established by Debtor's own expert."); *In re CRB Partners, LLC*, No. 11-11915, 2013 WL 796566, at *6 (Bankr. W.D. Tex. Mar. 4, 2013) ("It is true that any determination of the present value of collateral takes into account the time value of money and compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate.'"). Because the Plan does not provide for the payment of allowed interest, fees and expenses to Senior Lender on account of the debt to be paid from the Liquidating Collateral, the Senior Lender would be deprived of the indubitable equivalent of its presently oversecured Secured Claim.

**D.     The Debtors Want to Reduce the Indubitable Equivalence Standard to a Valuation Exercise and Ignore the Resulting Harm to Senior Lender's Existing Secured Claim.**

42.     The Plan baits the Senior Lender (and the Court) into a proceeding that assumes indubitable equivalence is merely an issue of valuing the Liquidating Collateral – meaning, if the Court establishes a sufficiently conservative value for the Liquidating Collateral then, at a minimum, the Plan should be allowed to proceed if Stoli USA agrees to be liable for the higher balance of Senior Lender's debt.  This way of thinking is wrong for at least three reasons.

43.     First, the remaining assets of Stoli USA would be insufficient to fully secure the
balance of Senior Lender's claim and would leave the Senior Lender undersecured.  That would
not be the indubitable equivalent of the Senior Lender's existing, oversecured claim.  For the
avoidance of doubt: no new or replacement collateral is being provided to the Senior Lender.
Article IV.D.6.g of the Plan refers to the possibility of the Senior Lender receiving a junior lien on
the same real property that will collateralize the GUC Claimants, but such junior lien has not been
offered to the Senior Lender.  Besides, the Senior Lender has recently had that property appraised,
and there is no equity in the property to benefit the Senior Lender and fill the collateral hole that
would result from a conservative valuation of the Liquidating Collateral.

44.     Second, valuing the Liquidating Collateral in that way would rob the Senior Lender
of the potentially higher recovery from the Liquidating Collateral that could be gained if the
Debtors (acting as fiduciaries, instead of servants to foreign ownership) orderly liquidated the
Liquidating Collateral.  If the Senior Lender is not going to be compensated for running a more
organized and longer process, then it cannot wait to sell the Liquidating Collateral and a forced
liquidation process would result.  It is not the indubitable equivalent of the realization of the Senior
Lender's Secured Claim to construct the worst, literally, liquidation process for the Liquidating
Collateral when clearly better alternatives exist if the Debtors are permitted by their owners (or
directed by a trustee) to maximize values for the benefit of creditors.

45.     Furthermore, as noted *supra* in Section VII, a higher post-reorganization debt
burden on Stoli USA would only worsen the Plan's feasibility.

46.     In sum, the Debtors want to have their cake and eat it too. The Debtors want to
ascribe a wildly favorable, hypothetical valuation to the Liquidating Collateral for purposes of
satisfying the Senior Lender's debt. But, at the same time, the Debtors are not willing to

compensate Senior Lender for the time and costs that would be required to presumably generate such a fair market return over the next several years. The only way the Liquidating Collateral might be worth more than the low-end the liquidation range would be in the Debtors' hands, the hands of a trustee for the Debtors or in the hands of a similarly situated market participant – not a bank. The inequity of the Plan in this regard is clearly not the indubitably equivalent realization of Senior Lender's Secured Claim, and the Plan should be denied on this basis as well.

## <u>RESERVATION OF RIGHTS</u>

47.     Senior Lender reserves its rights to file additional responses, affidavits and exhibits, submit additional factual and legal support and argument, and provide further responses at the Combined Hearing.

## <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, Senior Lender respectfully requests that the Court (i) sustain Senior Lender's Objection to confirmation of the Plan and approval of the Disclosure Statement, (ii) order the appointment of a chapter 11 trustee for the Debtors effective as of August 29, 2025, unless the Debtors have gained the Senior Lender's support for an amended Plan by such date and (iii) grant such other and further relief as it deems just and proper.

Dated:  August 5, 2025          Respectfully Submitted,
            Dallas, Texas

                                By: _/s/_ Brent R. McIlwain
                                Brent R. McIlwain
                                Christopher A. Bailey
                                HOLLAND & KNIGHT, LLP
                                One Arts Plaza
                                1722 Routh Street, Suite 1500
                                Dallas, Texas 75201
                                (214) 964-9481
                                brent.mcilwain@hklaw.com
                                chris.bailey@hklaw.com

- and -

Jeremy M. Downs
William C. Meyers
Steven J. Wickman
GOLDBERG KOHN LTD.
55 East Monroe Street, Suite 3300
Chicago, IL 60603
(312) 201-4000
jeremy.downs@goldbergkohn.com
william.meyers@goldbergkohn.com
steven.wickman@goldbergkohn.com

*Counsel to Fifth Third Bank, National
Association*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on August 5, 2025, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing (ECF) System on all parties registered to receive electronic notice in this case.

<u>/s/ Brent R. McIlwain</u>
Brent R. McIlwain